Argued February 8; affirmed February 29, 1944

# ERB *v.* CANCILLA

(146 P. (2d) 101)

Before Bailey, Chief Justice, and Belt, Rossman, Brand and Hay, Associate Justices.

*W. B. Shively,* of Portland, for appellant.

*Wallace Smith,* of Portland (Kneeland, Smith & Pipes, of Portland, on the brief), for respondent.

BRAND, J.

There are two assignments of alleged error: First, the refusal to give an instruction requested by the defendant, and, second, the denial of a motion for a new trial based on newly discovered evidence. No motion for a nonsuit or directed verdict was made. The instruction requested by the defendant and refused by the court was as follows:

"Under the rule of proximate cause, the damages must be proximate to the wrongful act; that is, in this case if you find that the defendant has committed the acts as charged by plaintiff and in accordance with the instructions I have given you, the damages must follow in unbroken sequence without any independent cause therefor, and in this connection I instruct you that there has been no evidence introduced in this case beyond that of speculation which establishes the fact that the present condition of plaintiff's eye was due to or caused by any act of the defendant. You are therefore further instructed that if you find the defendant committed

the acts charged in plaintiff's complaint, in accordance with the instructions that I have heretofore given you, your verdict, if for plaintiff, shall be for nominal damages only and such punitive damages as you may in your discretion award in accordance with the instructions I have given you. The term 'nominal damages' means damages in name only and not in amount, and such damages are to be awarded where a legal right has been shown to have been violated but no actual damages have been proved to have been sustained by the plaintiff as a proximate cause of the violation of said legal right.''

◼ In order to determine the propriety of the requested instruction relative to the allaged injury to plaintiff's eye, we must examine the testimony. The question for our determination is whether there was substantial evidence that the defendant struck the plaintiff and that the blow was the approximate cause of the loss of vision in plaintiff's left eye. In determining this question we are concerned only with the evidence and the inference therefrom which tended to support the plaintiff's contention. There was strong evidence for the defendant tending to show that no blow was struck and that no damage was proximately caused to the eye, but the jury resolved the issues in favor of the plaintiff, and this court is bound by their decision.

Turning to the evidence supporting plaintiff's contention and assuming for our present purpose that it is true, the following facts are disclosed. There is ample direct evidence that the defendant committed the assault and battery upon the plaintiff by striking him across the face with a rope. Defendant was attempting to fasten a half inch tow rope to the front

of the truck in which plaintiff, his wife and child were sitting. His purpose was to attach that vehicle by the rope to the rear of his own car which the defendant had placed directly in front of the truck in which the plaintiff was sitting. Defendant intended in this manner to take possession of the truck from the plaintiff by towing it away, his claim being that the purchaser of the truck had failed to keep up the payments alleged to be due on it. The truck in which plaintiff was sitting had been sold by the defendant to the plaintiff's brother, Paul Erb, and the plaintiff had been using it for the hauling of wood as an employee of his brother, the purchaser. Upon defendant's attempt to fasten the two vehicles together with a rope, the plaintiff got out of the truck, took hold of the rope and attempted to prevent the defendant from accomplishing his purpose. Each of the parties held fast to the rope, and in the course of a heated argument pulled and tugged at it for a period of about ten minutes. Finally, the plaintiff released his hold upon the rope, and as he stood talking with the defendant's son, Joe Cancilla, the defendant, with a vile epithet, struck the plaintiff with the rope across the plaintiff's face, nose and left eye. The plaintiff testified:

"I happened to see something out of my left eye, and before I could even duck he hit me right there in the eye, and I threw up my hands like that, and he hit me again right across the hands.

"Q With what, Mr. Erb?

"A A rope.

"Q He had the rope in his hand?

"A In his hand, when I let go of it."

The defendant produced a rope measuring twelve feet in length which he asserted to be the one in question. It was received in evidence, but the testimony of the

plaintiff is to the effect that it is not the one which the defendant used, the plaintiff's contention being that the rope employed by the defendant was much longer. In any event, the rope used by the defendant was of the same size as the one in evidence.

The remaining question therefore is whether the blow across the plaintiff's face administered with the rope which is in evidence or a similar one proximately caused the loss of sight in plaintiff's left eye. The evidence discloses that the defendant was standing on the plaintiff's left. The rope was doubled in defendant's hand. He swung it and struck the plaintiff in the left eye and across the bridge of the nose. The blow was sufficiently violent to break the skin on the bridge of the nose. After the assault plaintiff felt a stinging sensation on the bridge of his nose and discovered a small cut which was bleeding. Concerning the condition of his eye immediately after the altercation, plaintiff testified:

"A I almost had my hand on it all the time, because every time I would get my hand off it would just keep wetting all the time, and I was rubbing it.

"Q Did you notice any blood after this assault when he hit you with this rope?

"A Not until I left his house.

"Q When did you notice blood then?

"A On my hands, from rubbing my eye, because my nose right here was cut."

* * *

"Q Now how did you feel after that?

"A It bothered me for about five weeks. I mean really bothered. What I mean is watering and getting sore and getting bloodshot and irritated for about five weeks.

"Q Could you see out of your eye?

"A Not right then; it was just too watery to even try to see. But that night, you know, after that went away for the time being, I tried to see my hand and I couldn't even see my hand in front of me."

Plaintiff's brother, Paul Erb, saw the plaintiff in the evening of July 22nd, the day of the assault. The plaintiff was holding his eye. It was bloodshot and there was a "scratch or a little cut" on the nose, and the blood was "just barely oozing along there." Plaintiff was complaining of pain and inability to see. "He was frightened and hurt and couldn't see out of that eye." From the testimony of two eye specialists, it appears beyond question that plaintiff was suffering from a dense cataract in his left eye. The lens was completely opaque. There was a small scar in the cornea and a hole in the iris back of the cornea. The cataract was due to some injury, and it was the result of fluid getting into the lens.

The expert testimony discloses that the wound in the eye lay horizontal and was about one and a half millimeters in length and one-half millimeter in width. There is evidence that the cornea is from five tenths to six tenths of a millimeter in thickness. A millimeter is about one twenty-fifth of an inch. Dr. Taylor testified:

"Well, I was just going to say that the blow itself would press the cornea. Of course, it is really compressed. Anybody could push that in, so that anything that would perforate through the cornea itself and extend on to the other side could naturally perforate the iris and the lens; anything that was longer than the thickness of the cornea, which is five to six tenths of a millimeter."

He also testified:

"Q Having in mind your experience, Doctor, as an eye specialist, in your opinion would you say that a rope that hit an eye, that came across like this, such as this (illustrating), could have caused the injury that you found, this penetrating injury that you found to this eye?

"A Not unless there was something on the rope or something projecting from the rope—the rope itself.

"Q By that you mean a piece of wire, or something of that nature?

"A Something sharp enough to perforate that eye. The rope itself I can hardly conceive would cause it."

Calling attention to the rope and to the fact that "it has stickers", Dr. Taylor testified as follows:

"Q Could one of those, perhaps, be the object of causing the piercing wound?

"A It would take more than one to do it, because the barbs are rather small. Perhaps a small group of these barbs—the rope is rather stiff when you pick up—when you pick up some portions of it they are pretty stiff. Perhaps it is possible that they could."

Referring to the evidence that the wound was of a penetrating nature, Dr. Beattie testified:

"Q It was your conclusion, Doctor, that the cataract now exhibited by this plaintiff was caused by that particular penetrating wound?

"A Well, it is a logical assumption, but it is not an assurance.

"Q You felt that the cataract had been caused by this injury?

"A Yes. Well, I would like to qualify this. Any kind of a blow, a contusion like a hit with a fist, is sufficient to cause a cataract, and this man has

a cataract, and he also has evidence of a penetrating wound of the eyeball. The logical thing is that the thing that went that deep also caused the cataract. However, he could have had two things that have caused the cataract.''

Both doctors testified in substance that it was unlikely that any of the fibers of the rope which was in evidence would have penetrated the eye, but Dr. Beattie testified that ''it is possible that a fiber could, yes.''

The defendant relies upon evidence of a prior injury to plaintiff's eye and contends that the jury was left entirely to speculation in determining which injury was the cause of the cataract. Over three months before the assault by the defendant, the plaintiff was holding a ''cold cutter'' or rivet cutter by a long handle while another man struck it with a sledge for the purpose of removing a rivet. A glancing blow caused the handle to fly up, with the result that either the handle or the plaintiff's own hand struck the plaintiff on or above the eye. The evidence is that he suffered a black eye as a result, which lasted a few days, but that it was a ''very trivial matter.'' The plaintiff never complained of inability to see as a result, and it did not affect his vision. Dr. Taylor testified that a cataract usually shows up ''in a matter of a few weeks'' after the injury causing it, which strongly indicates that the April injury did not cause the cataract. There was no evidence of any penetrating injury in connection with that incident. On the other hand, there is evidence that the plaintiff's vision was normal immediately before the assault and that his inability to see followed immediately thereafter. If a cataract can be caused by a blow with a fist as the expert testified, we think it equally possible that it could have been caused by a

blow with a rope. Again, if the blow was of sufficient strength to perforate the skin on the bridge of plaintiff's nose, we think the jury would be warranted in finding that it could also perforate the cornea of plaintiff's left eye.

■ Neither the plaintiff nor the jury was bound by the opinion evidence of the experts. There may be cases involving difficult questions of medical science in which expert testimony on the issue of proximate cause would be indispensable. In an action of that character against a physician for malpractice, it sometimes becomes necessary for the plaintiff to prove not only that the alleged negligent act could, but probably did, cause the injury complained of and to prove it by expert testimony. This is not such a case. There is substantial evidence that the blow with a rope could have caused the injury, that the eye was normal before the blow, that it became bloodshot and painful immediately thereafter and that the loss of eyesight dated from that moment. There is evidence that the cataract did not result from the black eye which plaintiff suffered in April, and there is no substantial evidence of any other injury which could have caused it, with the exception of the blow struck by the defendant.

■ It follows from what has been said that the court did not err in refusing to give the requested instruction set forth above. That requested instruction was incorrect in two respects. In the first place, it states that there has been no evidence beyond that of speculation to establish that the defendant's act was the proximate cause of the injury to the plaintiff's eye. We hold that there was substantial evidence for the jury on that issue.

■ The instruction is also bad because it would have advised the jury that if they found for the plaintiff they should award nominal damages only and such punitive damages "as you may in your discretion award in accordance with the instructions." Even if there were no evidence in the case that the "present condition of plaintiff's eye" was due to the act of the defendant, nevertheless the plaintiff would have been entitled to compensatory damages as a result of the assault. It follows that no error was committed at the trial.

■ There is one other assignment of error, namely, that the court erred in overruling defendant's motion for a new trial. Affidavits have been submitted which tend to show that after the trial the defendant discovered a new witness, and it appears that the defendant was not at fault in failing to call him in the course of the trial. The testimony which the witness would have given was purely cumulative, however, and we think that the trial court did not abuse its discretion in denying the motion for a new trial. *State ex rel. Kunz v. Woodmansee,* 156 Or. 607, 69 P. (2d) 298 (1937). The reason which is given in the affidavits as an excuse for the failure to call the witness at the trial is that the prospective witness lied to the defendant by informing the defendant that he did not see anything that transpired between the plaintiff and the defendant. The witness now swears that he did see everything that transpired. It was not necessary for the court to grant a new trial in order to permit the jury to hear cumulative testimony from a witness who now swears that he lied concerning the identical transaction about which he now offers to testify.

The judgment of the circuit court is affirmed.